Denio, J.
It is not material to determine whether it is established by the admissions in the pleadings or the finding of the referee, that the two railroad companies, which together formed the line of transportation between Buffalo and New-York, were partners. It is somewhat uncertain whether the plaintiffs should be understood to aver in the complaint that both companies were common carriers for the whole distance, or only that they ran in connection as a continuous line, each being carriers upon their respective roads; and the same indefiniteness of state *248 ment is found in the report of the referee and in the bill ol exceptions. In both these papers it is stated that the defendant, the New-York and Erie Railroad Company, was a common carrier between the cities of Buffalo and NewYork, in connection with the Buffalo and New-York City Railroad Company. They might run in connection and together cover the whole distance, each company being carriers over its own road only; or they might, if the law will permit such arrangements between railroad companies, be copartners as carriers over the entire road, as is sometimes the case in lines of stage coaches. (See Bostwick v. Champion, 11 Wend., 571; S. C. in error, 18 id., 175.) The question could only be material in reference to the plaintiffs’ argument, that the carriers having received the property and commenced the transit, could not afterwards allege the accumulation of freight at a point on the route as an excuse for not delivering it at the terminus without delay. If it were essential to decide that question, I should hold that the statements were insufficient to enable us to adjudge that the two railroad companies were partners; but I am of opinion that whichever may be the proper construction of the allegation in this respect, we cannot disregard the fact that two separate railroads were employed in the transportation of this property from Buffalo to New-York, and that the point where they united at Hornellsville was a depot where delay might happen in consequence of an excessive accumulation of freight at a particular season. Whether, therefore, the two railroads were copartners, or only carriers over their respective roads, the place where this freight was taken upon the New-York and Erie road, was “the place of starting,”-or “junction” of railroads, referred to in the act of the legislature to be presently mentioned. The thirty-sixth section of the general railroad act, is in the following language: “Every such corporation shall start and run their cars for the transportation of passengers anl property, at regular times to be fixed by public *249 notice; and shall furnish sufficient accommodation for the transportation of all such passengers and property, as shall within a reasonable time previous thereto, being [be] offered for transportation at the place of starting and the junctions of other railroads, and at usual stopping places established for receiving and discharging way passengers and freight; and shall both transport and discharge such passengers and property at, from and to such places on the due payment of the freight or fare legally authorized therefor; and shall be liable to the party aggrieved, in an action for damages, for any neglect or refusal in the premises.” (Laws 1850, p. 231.) The act contemplates that it may not always be in the power of a railroad company to dispatch either passengers or freight immediately upon their arrival at a station or junction, and it therefore allows the company a reasonable time after their arrival and the offer of property for transportation to set it in motion from such starting point or junction. What is a reasonably period, must depend upon the actual circumstances existing^ at the time the property is offered for transportation. In the absence of any cause for delay it should be sent immediately forward, as the owners of property destined to a market may always be presumed to desire its arrival at the earliest practicable time. The referee has found that the defendants’ road was in good order and well equipped with cars and engines; that during the month of January, (the property in question having been received on the 18th day of that month,) a larger amount of freight than usual had been received by the defendants to transport to New-York, and that the amount so received and accumulated exceeded the then capacity of the defendants to remove, though they ran as many freight trains as could be ran with safety; and that such accumulation formed an excuse for the delay which occurred in this case. We are to presume that these facts were found upon sufficient evidence. We have then, this state of facts. The defendants were without fault in *250 respect to the state of their roads; they had provided sufficient cars and engines and sent forward as many freight trains as safety would permit, but owing to an unusual demand for transportation at that time, the plaintiffs’ property could not be sent forward faster than it was sent. If, under such circumstances, a railroad company would be liable on account of a tardy delivery, the business would be quite too hazardous to be followed by prudent men; for, whether the carrier is answerable for losses occasioned by a falling market or not, he certainly would be for the interest upon the value of all the. property, the delivery of which was delayed by his fault. But the law is not so unreasonable. A carrier may lawfully refuse to receive goods offered for transportation, because his coach is full, or because he has not the means of transporting such goods, or a carrier by water may refuse to take them until he is ready to sail. (Morse v. Slue, 1 Vent., 190, 238; Lane v. Cotton, 1 Ld. Ray, 646, 652; Story on Bailm., § 508.) The statute which has been referred to, is designed to bring these railroad lines within the general principle of common carriers, with such variations as the nature of the business requires. They are required, for instance, to have regular times for starting their trains, of which public notice is to be given, and they are to take all kinds of property which may be offered, in which particular they are held to rules which do not apply to other carriers; but then, as even their means of transportation are not wholly without limit, they are to have a reasonable time after the freight is offered, to send it forward.. If, when a particular parcel is' offered, the next train is filled up, the goods must wait for the succeeding train, or if on account of an unusual accumulation, the means of transportation for several successive trains, or for several days are anticipated, the property must remain until its time sta.11 arrive, subject to the qualification, that the company must not be in fault in providing sufficient accommodation for the general trafic of their road under ordinary cir *251 cumstances. The plaintiffs’ counsel maintains that these principles are inapplicable to this case, because, as he insists, there was but a single line from Buffalo to New-York over the whole of which the defendants were carriers, and the property having been embarked at Buffalo, there could be no excusable delay afterwards. But the plaintiffs knew that then- property was started upon a branch road, and that the defendants’ main line extended west beyond the junction oi the road running from Buffalo, and that an accumulation at the junction might cause a delay as probably as at Buffalo." It is not stated in the report where the detention of these , goods took place, but as it is found that the delay was owing to the accumulation of freight, we must assume that it was either at Hornellsville or at some station where freight was received for transportation. We are not to assume that an undue preference was given to other freight over that of the plaintiffs, for it is specially found that this property was transported and delivered as soon as other property, during the period in controversy.
The law, upon well known motives of policy, has determined that a earner shall be responsible for the loss of property entrusted to him for transportation, though no actual negligence exist, unless it happen in consequence of the act of God, or the public enemy; but when the goods are actually delivered at the place of destination, and the complaint is only of a late delivery, the question is simply one of reasonable diligence, and accident or misfortune will excuse him, unless he have expressly contracted to deliver the goods within a limited time. (Parsons v Hardy, 14 Wend., 215; Harmony v. Bingham, ante, 99.) I am of opinion that the finding of the referee establishes that there was no culpable want of diligence on the part of the defendants in this case and that they are not liable to the plaintiffs for any damages.
Having come to this conclusion upon the main issue, we ought not to lay down any rule upon the subject of the *252 damages which the plaintiffs would have been entitled tc recover if they had established a cause of action. If we should do so, it would not furnish a precedent by which those who may succeed us in this court or the community would be bound, should we even consider ourselves concluded by it. It is only upon points necessarily involved in the determination of causes, that the judgments, even of the highest appellate courts, furnish authoritative adjudications. .For these reasons we forbear to express any opinion upon the question whether carriers who undertake to transport merchantable commodities to market, are liable for damages in consequence of a decline in the market, where a delivery has been delayed through want of diligence in the carrier, although that question has been very intelligently argued upon the printed briefs, and we are, moreover, furnished with an unusually elaborate and able opinion upon that question delivered in the supreme court. The judgment should -be affirmed.
Johnson, Crippen, Dean and Marvin, Js., concurred in the foregoing opinion.